Good morning. It's nice to be back. May it please the court, my name is David Porter. I'm an assistant federal defender in the Eastern District of California, and I represent the appellant Ronnie Winn. The most unreasonable thing that the state court of appeals did in this case was to accept at face value the justification of trial counsel gave for not calling certain defense witnesses that they had criminal records. Now, to paraphrase an Illinois politician, you go with the witnesses you have, not the witnesses you want. Counsel, there's a problem that I saw with your argument on that. One thing that experienced trial lawyers always are careful of is presenting a witness that the jury will really hate, and they absolutely hate the ones that they think are lying to them. I frequently avoided calling a witness whose testimony would be helpful to my client where I thought the jury would think he was a liar, whether they were right or not. Expert witnesses are really dangerous that way. You call an expert that the jury thinks is lying, you tend to lose. And these witnesses, it looks as though the lawyer thought, with good reason, that the jury thought they'd be lying. Well, that really hurts his case. So it seemed to me that that's why it was so easy for the California court of appeals to say, no, that's not ineffective assistance, it's just the kind of tactical judgment trial lawyers make every day. Judge Kleinfeld, your premise is incorrect. Carl Speakerman filed a declaration in this case about why he didn't call those witnesses. He fell on his sword. I know, but the law is that the court doesn't have to accept that. He filed a declaration under penalty of perjury that did not say, I was afraid that these witnesses would lie, and that's why I didn't want to put them on the stand. I fully agree with you. As a criminal defense lawyer, juries hate people who lie, and they don't like to, and they will take that against the defendant. But the declaration that he filed under penalty of perjury says, the reason I did not call J. King as a witness was that his criminal history would have made his testimony of little value. Similarly he did not, in fact, he fell on his sword with respect to some other issues that are not before us, if that's the phrase. I mean, he said as to some other issues, I made a mistake. As to these issues, he did not say he made a mistake. He actually said otherwise. He said, I made a tactical decision. Absolutely. And the tactical, I mean, the court of appeals accepted as a tactical reason, and as this Court has explained on many occasions, calling a decision tactical by a trial court, trial lawyer, does not immunize that decision from Federal habeas review, and that is most prominently in this Court's decision in Jennings v. Woodford. The tactical decision must be a sound one. It must be reasonable and based on informed decision. It is unreasonable, Your Honor, because it's very important as a criminal defense lawyer, it's crucially important to determine whether your client has criminal history before you put your client on the stand. But for percipient witnesses, I mean, all of the witnesses in this case, every one of them, the prosecutions include, except for the policeman, had criminal histories or similar credibility problems. If you look at page 5 of our reply brief, you'll see Julian Bridgett Hall, convicted of felony DUIs, Jay Batyal, the victim's friend and roommate, consumer. You're absolutely right. They're all a bunch of lowlifes. There was no question about that. But I still don't understand why a defense lawyer can't make a tactical decision that this particular lowlife is going to have especially bad credibility in the circumstances. Because there's no support for that in the record, Your Honor. Well, there is support in that he says so. But the other the other. That's evidence. The other prosecution, the other witnesses here. He says I did it for tactical reasons. You say couldn't have. I didn't say couldn't have. I said that those tactical reasons apply equally to the other witnesses in the case. He did, in fact, say with regard to one of the three that he had particular credibility problems. Yes. And as to that, that was Reynolds, Jackie Reynolds. And I would agree. I would agree that that was a set-up. He couldn't remember things. He couldn't remember the dates. He had to be prompted. So we're talking about two people, basically. We're talking about Jay King and Linda Mitchell. And it would be helpful to me, and I know you did this in the brief and you did it well, but it would be helpful to hear exactly what they would have said that could have made any difference here. Yes. Linda Mitchell. Now, let me just backtrack a minute. Did the California court say that there wasn't prejudice, or did it say that there was not ineffectiveness? I don't think they were they pinpointed. I think their discussion goes mainly to prejudice, that it wouldn't have made a difference. Okay. So I'd like to know, I mean, because here, my understanding is that the case against your client, with regard to the key question of whether he, you know, actually stumped this guy, is really not that strong. One person said it, and he said otherwise. Yes. But it's not clear the case stops there in the sense that that isn't essential to the ultimate conviction. And that's why I'm having some trouble on the prejudice question. Right. Well, it does kind of stop there, because recall that he was my client was acquitted of second-degree murder. He was convicted only of involuntary manslaughter. The intent element goes away. Now, all that we're talking about here is causation. Did he? Yeah. But he does say that he punched him, and other people say he punched him in the face, even if he didn't stomp him. So the question is, how does any of this, the details of what these people would have said, and I suppose also the medical person, could have made a difference. Right. That's because, crucially important, his other people also hit him, also hit him in the face. Ed Nunez, you know, the prosecution and the court of appeals keeps calling Ed Nunez Mr. Rendleman's friends. Well, with friends like Ed Nunez, you don't need enemies. He was called by a witness, as a witness, by the defense, and admitted that he had hit the defendant. He, along with Simone Grimes, I believe, had hit the defendant, Mr. Rendleman. Several days before. Several days before. But Linda Mitchell, you asked about Mitchell's testimony, and I think, let me get to that, because I think that's pretty compelling. She lived in the same apartment complex as Mr. Rendleman. She would have testified that she heard disturbance upstairs at Rendleman's apartment. On many occasions testified that, quote, there was constant verbal and physical fighting at the upstairs apartment where Rendleman lived. She often heard yelling among Jay Batial, a girlfriend, Rendleman, Nunez, and Simone Grimes. She had seen Rendleman's girlfriend, Gail Reed, attack him on several occasions, hitting him on the face and body. And finally, Mitchell could have testified that Petitioner rarely went up to that location. That is from Speakerman's, the trial counsel's, declaration signed under penalty of perjury. I think her testimony, the testimony of Jay King, would have been crucial. He testified that he had seen Batial on prior occasions both buy and use crack cocaine. He would have testified that he advised Linda Crawford not to go up to where Petitioner was. He heard Mr. Wynn screaming from the apartment. I don't think that that has any relevance. Everybody agrees that Wynn was hit over the head with a beer bottle and was screaming. And Batial wasn't the – I don't know what the relevance of him using crack cocaine is. So in general, none of these people were going to say that Nunez's testimony that Wynn hit Rendleman over the head, I mean, kicked him and stomped him and hit him in the head, wasn't so. No. But they would have provided crucial collaboration to Wynn's statement. Wynn's statement to the police came in during trial. And he had talked about how Nunez and Simone Grimes and Gail Reed as well had hit Rendleman before the incident. And the prosecution is saying, oh, well, the jury didn't believe that. The jury can't see any of these people, incidentally. No doubt the trial lawyer did see him because it says in the court of appeals decision that he investigated their testimony. Was the girlfriend bigger than the man who was killed or smaller than the man who was killed? You know, I don't know that. What about the defendant? Was he bigger or smaller than the man who was killed? I believe the defendant was bigger than Mr. Rendleman. But Nunez was quite large, so that's – but did either Mitchell or – who was the second person? King. Was it King? Did either of them testify about the prior beatings? King did not testify at all. King was the parent. I don't mean testify. I mean, would they now testify? King would not have testified about beatings. And Mitchell? Mitchell would have. I thought the only one who was – Yes. Yes. Mitchell. Mitchell testified. She lived in the apartment complex and she heard physical fighting upstairs. Right. I think one of them were there. Am I correct? The time that the – J. King had left just before and was outside. Downstairs. Mitchell was downstairs. That's correct. And the fact that there were prior beatings was in the record. I mean, in the trial record. It is, Your Honor, because Mr. Wynn's statement to the police came into evidence. But that is very different than – But also because Nunez testified that it happened. Also because Nunez testified. But Nunez obviously had a lot of bias. He downplayed the injuries. He said the next day we – Rendleman and I shook hands and made up. And they're talking about friends and everything. And the point is that Mr. Wynn's needed corroboration. I'm sorry. You could have blamed it on Nunez if Mitchell and King had testified that even though they weren't there, it sounded kind of like Wynn was the victim rather than the aggressor when they heard the noise, and they would corroborate the fact that everybody used to beat up on the victim. I think that could – I think that would draw – Is that about the case? Yes. I think that – and I think that you could draw inferences, and if further investigation was done and had they been called to testify – But, Mr. Porter, even of what Judge Kleinfeld just said, the second part, as I understand it, didn't come in through Mitchell and King. In other words, the part about everybody used to vote – used to beat up on the victim, the person who would have said that is Reynolds, who you've agreed, I mean, pretty much there's not an IAC claim about. So Mitchell and King didn't even say that, right? No, but they did – but Mitchell did talk about hearing the fighting. Yes, but she didn't say that everybody used to beat up on the victim. No, but I think that could be reasonably inferred by the jury, and if she had been called as a witness, that information could have come out. What about the causation? I know you're almost out of time. I mean, frankly, I found Mills troubling, the causation piece, because the premise of the State court for not worrying about it was that there was absolutely no evidence that anybody else could have done this, and that's just blatantly untrue, because the witness – the defendant's testimony was that Nunez didn't. Yes. That's absolutely – that's completely not only unreasonable, but objectively wrong. But the other thing that the court of appeals said was that, oh, well, Calgic 290 was like waving a magic wand, and that would cure all the causation instruction problems. Well, 290, Calgic is the basic government has to prove a case beyond a reasonable doubt instruction. That does not highlight the causation. Why couldn't the causation be fully argued under the instruction that the defendant had about proving beyond a reasonable doubt that the defendant caused the death? Oh, sure. It could be argued, Your Honor, but fundamental fairness requires that. The idea of the instruction is to give you the ability to argue it so that the jury sees that the prosecution does indeed have to prove that. Yes, but they must be instructed on the law as well. And the law on causation is very – requires 3.30, 3.40, 3.41 of Calgic. It requires the law to be given, not just the jury. Was there an instruction, either the beyond a reasonable doubt or one of the murder instructions that talked about causation at all? No. That said that he had to cause the death. I don't believe so. I think it was basically 290. I think that the government's burden beyond a reasonable doubt to prove the elements of the crime. Right. But was one of the elements of the crime that they were given, causation? I haven't read the jury instructions sufficiently. It said something about kill, I think. But the particular idea that he had to be the person who caused the death, was that anywhere in the instructions? I can't answer that. I'm sorry. But if there are – Were there instructions without looking at the instruction? I'm sorry? I didn't see the instruction either, and I was kind of surprised. I thought I'd just see in the excerpt, here's the instruction and it's not good enough. Oh, no. It's in the briefs. It's a – he asked for 3.40 and 3.41 as modified, and I believe it's in the briefs. I sort of need the words. I've never done criminal defense in California. I can submit that in a 29-J letter. It's not in here already. We're out of time. Thank you very much. We'll give you a couple minutes in rebuttal. Thank you. Good morning. May it please the Court, my name is Pam Critchfield. Incidentally, do you happen to have that instruction handy, the one the jury got? Yes. ER – oh, what the jury got. No, I have what he requested, ER 63. It's sort of hard for me to judge the force of the request unless I know what they got. Okay. I'm looking at the State court opinion that deals with the causation instructions and it's on page ER 63. Well, I – And I don't see that they don't quote the instruction that was given. And I believe – Well, more than that, I mean, the one thing they say about it is clearly wrong. Unreasonable in the sense, i.e., that there was no evidence that anybody else caused this. Of course there was. The indefendant's statement was that Nunez didn't. Right. And the jury didn't believe it. Well, that's a different point. But the reason why the State court rejected this argument is just wrong. So the question is, what is the truth about these instructions? In other words, what was the instruction? Did anybody tell any – the jury at all that there was a causation issue in this case? As far as I can tell, I don't – In any sense at all? When they get – they – of course, when they read the instructions, they read the elements of the crime. Okay. And in the elements of the crime, the person who – Well, I looked for that and I couldn't find it and that's why I want to know where it is. And I apologize, Your Honor, I don't have a cite to that, but it is in the record. Well, where? We've got the excerpts right here. It's not in the excerpts. It would be – it would be in the – We're arguing about whether the instructions sufficiently enabled the jury to determine whether he committed the crime, but we don't know what it said. I believe what we're arguing about is whether the court of appeals opinion that the causation instructions requested by the Petitioner – I read footnote 9 in the court of appeals opinion. Right. But I can't find what the jury was told. I know what they weren't told and I know what reason the court of appeals gave why they didn't need to be told, but I don't know what they were told. Do you? I don't have it in front of me. Well, all right. I'm looking at the written version of the instructions. Were those instructions that were given? Do we know that? And I'm sure there are both, Your Honor. Here is what it says about – You could find the verbal ones in the reporter's transcript. All right. But if we're willing to assume that what was given was what was the claim they were going to give, I don't see a causation requirement in the definition of murder or in the definition of malice or in the definition of second-degree murder. And, well, let's see, second-degree murder, yes. The killing resulted from an intentional act. I suppose that's causation, but he wasn't convicted of that. And with regard to involuntary manslaughter, I don't see it. In order to prove this crime, each of the following elements must be proved. A human being was killed and the killing was unlawful. That's it. So how does that tell anybody that they're supposed to find causation? How does it not tell? It's – they're saying that this was an act, it was unjustified, and it was unlawful. How – and you have to find that this defendant did that act. I think that's what the jury found, beyond a reasonable doubt. That's the instruction. Instruction included what he was charged with? Yes. He was charged with murder in the second degree and then involuntary manslaughter. But he was found not guilty of murder in the second degree. So the second-degree murder instruction presumably is not helpful here. Right. Because they acquitted him of that. The California court of appeal found that there was not substantial evidence that the victim's death resulted from anything other than being – Is that a – is that even arguably reasonable? Absolutely. Why? Why, when you have this – the defendant's statement, he came in and he said, I saw Nunez stomping him and killing – and punching him. Now, why is – I mean, you don't have to believe it, but was there evidence? Of course there was. There's testimony from everybody else that corroborated that. The only testimony – as I understand it, with regard to the stomping and punching him in the face, the defendant said one thing and Nunez said the opposite. And that is it. Because the rest of them did not see that. And Badial also testified. No, he did not. He did not. Yes, he did. I'm sorry. Yes, he did. He testified. He didn't testify to the stomping. Right. But he testified to the punching and the kicking and the hitting. He did not see a stomping of the head. But if you go back and read Badial's testimony, he and Nunez, the only difference is exactly how the beating occurred. It's not both of them. Well, there certainly was sufficient evidence. I mean, that's not the issue. I would argue under Harrington v. Richter that the California court of appeals opinion that there was not substantial evidence is reasonable. They didn't consider what Petitioner said to the police as he was trying to get out of the whole thing, that he didn't do it or that Nunez did it, substantial evidence. And clearly, the jury didn't buy it. Okay. Well, you have more time, so go ahead. If you're talking about the main argument that's being made is with regard to the witnesses. I'm sorry? The main argument that's being made is with regard to the three witnesses. So I don't have anything to say about that. Just that the – there was definitely – there was a tactical decision. The court of appeal found in a reasoned opinion that it was not deficient performance to have made that tactical decision in light of the investigation and what was said in the Declaration of Counsel, and that there was no prejudice. And I don't have the site – oh, here it is, ER 86, 85 and 86. I don't have the site of ER 86 as the court of appeal's opinion. I would argue, or we would argue, that that's a reasonable – if there are no further questions, I would submit it on the briefs. Okay. Thank you very much. Mr. Porter. Thank you, Judge Berzon. Just two quick points. The first is, if the evidence was so overwhelming as the prosecution is claiming, the jury would not have come back with a compromised verdict of involuntary manslaughter. Second, if the – I don't know about that. Beating somebody to death is ordinarily manslaughter and not murder, I guess. That's often the way it's charged and typically the way it's convicted. No, but the way they're portraying it is that, therefore, the jury must have believed Nunez and disbelieved everything that Winn said, which, first of all, I don't believe is true because of the way it – All they need to think is that beating somebody is usually kind of an inefficient means of killing them. Shooting and stabbing work better, so it's usually manslaughter. And they work better because you don't have to worry about causation in those cases. The ninth injury was – No, you have to worry about causation every bit as much. The causation here is – was the central aspect of the defense. That was the centerpiece of the defense, is who caused the injuries that rendered – that ended in Mr. Rendleman's death. And those were the – that was the central part of the – Sorry? Who or what? Or what, yes. No, he's asking who or what. It was a question of what caused it. Or what caused it, yes, in the sense that there were – Exactly what sparked your question, I think. There was other evidence that he fell. Certainly the police officer who responded said that he fell. Mr. Rendleman fell down. But the last point I want to leave you with is that there were multiple errors in this case, and I think that we've done as good a job as we can in the brief of trying to portray how all of these errors, the two ineffective assistances of counsel, the two errors in jury instruction regarding third-party culpability and causation, all go to the same central issue in this case. And those multiple errors, even if one of the errors was – could be viewed as a case of win versus the mark, all of these errors did have a substantial and injurious effect on the jury. Okay. Thank you both for a useful argument in an interesting case. The case of win versus the mark is submitted. I think we will take a 10-minute break.  Thank you. Thank you. Thank you.
judges: Schroeder, Kleinfeld, Berzon